JOSEPH BURNS V. CITY OF FAIRMONT.

[FILED FEBRUARY 25, 1890.]

1. **Evidence:** DIRECTION OF VERDICT. Where there is not sufficient evidence to authorize a verdict for the plaintiff, it is the duty of the court to direct a verdict for the defendant.

2. ———: OBJECTION. When a question is asked a witness, to which objection is made, which is sustained, the party desiring the evidence must offer to prove the facts sought to be introduced in evidence. (*Mathews v. State,* 19 Neb., 330.)

ERROR to the district court for Fillmore county. Tried below before MORRIS, J.

*John Barsby,* and *Pound & Burr,* for plaintiff in error.

*Maule & Sloan, contra.*

NORVAL, J.

The plaintiff, Joseph Burns, brought this action to recover the sum of $656, claimed as a balance due him from the city of Fairmont on the following contract:

"LINCOLN, NEB., Jan. 12, 1887.
" *To the Hon. Mayor and City Council of Fairmont, Neb.:*
GENTLEMEN—I herewith hand you a proposal to furnish your city a water supply of (6400) sixty-four hundred gallons or (200) two hundred barrels of water per hour for (24) twenty-four consecutive hours' pumping, and I guarantee that said supply shall hold good for (6) six days, commencing my work in the bottom of your well now dug and walled up, and putting down an iron pipe (5) five inches in diameter to a sufficient water supply to furnish the quantity of water above called for, and furnish a first-class point (4) inches in diameter and of a sufficient length to admit of a free, easy flow of the water, putting in a section

of screen pipe or point at each vein of water, should it be deemed necessary, to secure the easy flow mentioned.   I will furnish all material and do all the work to complete the work and do a first-class job in every particular.   I will also put on a T on the top of the drive pipe in the dug well at or below the water line and move your steam pump over from its present well to the dug well, furnishing 10x12 timbers for a foundation and running through the wall and back in the ground, laying the end outside of the wall in a brick and mortar foundation, and then plank over or floor over with two-inch plank, putting this foundation down in the dug well at least ten feet from the surface of the ground, and then cut the pipes and fit the same with pump and all its connections so that it will stand on the above-mentioned platform in the well, all connected and fitted with one branch of the tee on the drive pipe at the bottom of the well.   I will also put on the other branch of the tee a 4½x14 inch cylinder, fitting the same with the discharge pipe and plunging rod running to the top of the well, connecting the discharge with the discharge pipe from the steam pump, the latter to be connected with the present discharge already laid.

" Also, furnish and set upon a fifty-foot tower a twenty-two foot Aldrich mill, known as the Nebraska Chief in this state, (the timbers and size of tower to be about the same as the one belonging to the B. & M. R. R. in Fairmont, and to be securely anchored, and the timbers of tower to be dressed lumber), doing all work and furnishing all material necessary to construct and erect the same in a first-class manner.   I will also disconnect the boiler from all its fastenings and lower it, after first digging down the boiler room the full size of said room, deep enough to permit of a floor to be laid on the present sills under the building without the boiler or any of its points interfering with or reaching the floor above.   I will then drift or tunnel from the boiler room to the pump platform over the

well, making it six feet high and three feet wide, cribbing the sides and top with two-inch plank, then connecting and fitting all steam pipes with pump, making a good and workmanlike job of the same in every particular, as good as it was before moved; in this it is not meant to include the foundation under the wall in the boiler house. The city also agreeing to give me all the pipe that is now in the wells attached to the pump or drove in the ground, if I can pull it, at my own expense. I to finish and complete the work; including everything necessary to furnish the water and make the change, except the foundation mentioned, all finished and complete, for the sum of ($1956) nineteen hundred and fifty-six dollars, to be paid me when the work shall be finished and tested and shown to fulfill the conditions of this contract as per above; the whole to be completed in ninety days from this date; the contract forfeited if not completed at that time, if due diligence is not shown by me in endeavoring to complete the work; and it is especially understood that the steam pump shall remain as it now is and in such condition that the water from the well now there can be used until the new well is ready for use, I to have the use of the boiler by furnishing fuel and engineer, providing I do not at any time interfere with the use of the boiler and the pump by the city.

"(Signed)                          JOSEPH BURNS.

"The above proposition is accepted on the part of the city of Fairmont, Neb., this 15th day of January, A. D. 1887.

"(Signed)                     JOHN BARSBY, *Mayor.*

"Attest:

"C. M. CLARK,

"[SEAL.]        *City Clerk.*"

The plaintiff alleges that he has in every respect complied with all the terms of the above contract on his part to be performed. On the other hand the defendant insists that the plaintiff has failed to furnish the quantity of

water agreed upon. The cause was tried to a jury and a verdict, by direction of the court, was returned for the city. The plaintiff brings the case here for review by petition in error.

The principal question presented for our consideration is, Did the court err in instructing the jury to return a verdict for the defendant? It appears that the plaintiff has been paid on the contract $1,300, and when the same was paid the city council of Fairmont entered upon its records the following, which was agreed to by the plaintiff:

"WHEREAS, A partial test has been made of the work done by Joseph Burns on his contract to supply water, and the council are not fully satisfied that the required amount has been fully furnished; and

"WHEREAS, Said Burns is desirous of receiving a portion of the money on said contract, and the council are agreed that it is proper that he do so; therefore, be it

"*Resolved*, That the sum of thirteen hundred dollars be advanced said Burns on said contract; provided such advance shall not be taken or construed as an acceptance or partial acceptance of said work, and shall not prejudice the rights of the city in any manner, and said Burns, by accepting said amount, agrees to these conditions; and further, the city shall have at least (4) four months from the passage hereof to fully satisfy themselves that said contract has been fulfilled, said Burns also waiving all technicalities or technical rights which may have accrued or shall hereafter accrue by the use by the city of the wells and machinery. Said Burns also agrees by the acceptance of said amount of money that all work done and all machinery furnished by him shall be the property of and belong to the city of Fairmont.

"Agreed to August 20, 1887.    JOSEPH BURNS."

At the trial in the court below the parties stipulated that if the court was of the opinion that, under the terms of the contract, it was the duty of the plaintiff to make any

further test of the quantity of the water to be furnished said defendant, then the finding should be for the defendant, and if the court be of the opinion that the said plaintiff was not to make any further test of said quantity of water, then the finding should be for the plaintiff in the amount claimed in the petition.

The only testimony in the bill of exceptions in regard to the testing of the quantity of water in the wells was given by John Henry, who superintended the work for the plaintiff at Fairmont. His testimony on that subject is as follows:

Q. Did you see the pump they had to lift water with?

A. Yes, sir.

Q. What kind of a pump would you call it?

A. I would not call it any kind of a pump; I think the maker of it was ashamed to put his name on it; I did not see any name on it.

Q. You may state, then, how many barrels of water per hour could you lift up with that old pump.

A. I could not say, exactly; I should think about 250.

Q. For how long a time would the flow continue?

A. I can't tell. You can't produce any vacuum with that pump; it was all full of holes, and we had to plug it up with wooden plugs.

Q. Had it any suction capacity whatever?

A. Very slight—a little. A good pump will suck water about twenty-seven feet.

Q. State how many barrels per hour the old pump would raise out of the well, as furnished to you by the city of Fairmont.

A. Well, after we worked a good deal on the pump, it would raise about 175 barrels an hour.

Q. How did you measure the flow of water to know how many barrels of water it would raise?

A. I did not measure it. The city council measured it, and decided that that was about the amount.

Q. Who was present at the test?

A. Mr. Cubbison, Mr. Gould, Mr. Moore, and I could not say whether the mayor was there or not.   I would not be sure whether he was or not.   They looked after it.

Q. How long did the test continue?

A. I did not time it.   It continued an hour, I presume, or two hours, until a part of the machinery that we had rigged up broke.

·Q. What was it broke?

A. It was a crank pin connected with the walking beam.

Q. Was that a proper pump to test this well by, in your opinion?

A. Which pump?

Q. The old one?

A. No, it was not.

Q. When the pump broke down was there any perceptible diminution in the flow of water from the well, up to the time when the pump broke down?

A. No, there was none.   *   *   *

Q. When was it this test was made?

A. I have not got the date of it.

Q. About when?

A. I could not say.

Q. Was it made just prior to the 20th of August, 1887?

A. I don't know.   I presume it was.

Q. Was it made prior to the payment of the money to Mr. Burns by the city?

A. I think it was.

Q. After you made that test, assuming that you made a test prior to the 20th of August, 1887, did you not make any further or other test of the quantity of water to be taken out of the well?

A. We had previous to that.   *   *   *

Q. How many days of the test were you there?

A. I was there the first day.

Q. How did it work that day?

A. Very satisfactory.

Q. How many barrels per hour did it lift out of the well at that time?

A. I did not keep any record.

Q. Who did keep the record?

A. I can't tell.

Q. Who was present when the test was made?

A. I was part of the time, Mr. Burns, and the city officials.

Q. The mayor and council of the city?

A. Yes, sir.

Q. You say no other or further test of this well was made after about the 20th of August, 1887?

A. Not to my knowledge. I left after that.

\* \* \* \* \* \* \*

Q. These two tests were made after the two pipes were driven?

A. Yes, sir.

Q. The flowing being into the well?

A. Yes, sir.

Q. When you first opened the first pipe that you drove, how much water did the rise in the tube indicate?

A. It stood about 100 feet deep in the tube. The well was about 109 feet from the bottom of the dug well, and it stood within about nine feet of the bottom of the dug well, showing about 100 feet of water.

Q. When you opened up the second pipe how much water did it indicate?

A. The same thing.

It clearly appears from the testimony that the tests made by the plaintiff failed to show that the wells were capable of furnishing a water supply of 200 barrels of water per hour for twenty-four consecutive hours' pumping and that such supply would be good for six days. The tests only showed a supply of 175 barrels for one or two hours. It does not appear that the tests were even continued for

twenty-four consecutive hours, much less for six days. By the terms of the contract the city was to pay when the work was finished and tested and shown to fulfill the conditions of the contract. The fact that the plaintiff partially tested the capacity of the wells shows that it was his understanding of the contract that he was required to demonstrate by practical means the quantity of water they were capable of supplying. The parties having thus construed the contract, we are warranted in adopting the same construction. Should the plaintiff yet make the required test he can recover.

The resolutions of the city council, under date of August 20, and signed by Mr. Burns, recognize that only a partial test had been made and that the council were not fully satisfied with the supply of water. It does not appear that any test was ever made after the payment of the $1,300. Before the plaintiff could recover we think it was his duty to establish by evidence that the wells had the capacity to furnish the quantity of water called for by the contract.

The fact that the city has been using the wells and machinery does not waive the terms of the contract or prejudice the rights of the city. The plaintiff expressly agreed that it should not. There being no conflict in the evidence, and the plaintiff having failed to show that it had furnished the city the requisite supply of water, the court did right in instructing the jury to return a verdict for the defendant.

The plaintiff cannot complain of the failure of the court to reduce to writing its instruction to the jury. The parties stipulated that the court should instruct orally. (*Fitzgerald v. Fitzgerald*, 16 Neb., 414.)

The last contention is that the court erred in sustaining the defendant's objection to several questions propounded by the plaintiff to the witness Henry. Error cannot be predicated thereon, because the plaintiff made no offer to prove the facts sought to be introduced in evidence. (*Math-*

*ews v. State,* 19 Neb., 330; *Masters v. Marsh,* Id., 462;
*Lipscomb v. Lyon,* Id., 522.)

There is no reversible error in the record, and the judgment is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.